J-S20030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF A.K.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1657 WDA 2018 |

Appeal from the Order Entered October 18, 2018
In the Court of Common Pleas of Elk County Civil Division at No(s):  CP-24-DP-0000013-2016

BEFORE:  GANTMAN, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED MAY 23, 2019**

D.S. ("Mother") appeals from the decree entered in the Court of Common pleas of Elk County changing the placement goal of A.K.W. ("Child") from return to parent or guardian with the concurrent goal of adoption, to adoption alone. Mother challenges the sufficiency of the evidence. We affirm.

In its October 18, 2018 opinion, the trial court aptly summarized the factual and procedural history of this case, which we adopt for purposes of this appeal. **See** Tr. Ct. Opinion, filed Oct. 18, 2018, at 2-8.

By way of background, Child is the daughter of Mother and C.W. ("Father").[1] Mother and her then paramour were residing with Child when the trial court first placed Child in the emergency custody of Elk County Children

---

[1] Despite consistently receiving proper notice, Father has not appeared at any hearing regarding Child and has had minimal contact with Child in general. Father has not pursued an appeal from the instant goal change order.

and Youth Services ("ECCYS"). The court removed Child from Mother's custody, in October of 2016, due to pending criminal charges against both Mother and her paramour for the physical abuse and assault of Child. Ultimately, a jury convicted Mother of endangering the welfare of Child in January 2018. In November 2016, the trial court adjudicated Child to be dependent and placed her in the custody of foster parents.

The trial court conducted several permanency review hearings over the course of 2017 and 2018. The court found that Mother's progress was "minimal," and Father never demonstrated any progress toward alleviating any of the conditions that led to the placement of Child in the custody of ECCYS. While Mother did complete some recommended therapy, she failed to attend various appointments and demonstrated her instability by failing to retain employment and housing, at least initially. Further, while Mother did consistently attend visits with Child, Child did not exhibit a positive attachment to Mother during the visits and exhibited regressive behavior after the visits. Mother's new paramour has demonstrated a positive relationship with Child. At the conclusion of each permanency review hearing, the court determined that Child should remain in the custody of foster parents, who are an adoptive resource for Child.

In February 2018, ECCYS filed a motion to change the placement goal for Child to adoption. The trial court conducted a hearing on June 13, 2018, at which Dr. Allen Ryen, a licensed psychologist, testified regarding his bonding assessment of Child. He found that Mother and Child had an "insecure

bond" that was "unhealthy" and not indicative of a primary bond. On October 18, 2018, the trial court issued the order, here at issue, which granted ECCYS's motion to change Child's placement goal to adoption.[2] Mother filed the instant timely appeal.

Mother raises a single issue for our review: "Whether the trial court abused its discretion in finding that [ECCYS] produced clear and convincing evidence to warrant a change of the permanency goal from 'reunification' to 'adoption'?

We review a court's order changing the placement goal to adoption for an abuse of discretion. *In re N.C.,* 909 A.2d 818, 822 (Pa.Super. 2006). Section 6351(f) of the Juvenile Act, in pertinent part, requires a court to review, *inter alia*, the following at permanency review hearings:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

---

[2] On March 1, 2018, ECCYS filed a petition to involuntarily terminate the parent's parental rights. The trial court's October 18, 2018 order indicates that a hearing regarding the termination petition was forthcoming.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

42 Pa.C.S.A. § 6351(f).

When determining whether to change the goal, the trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. ***In re N.C.***, 908 A.2d at 823. "Safety, permanency, and well-being of the child must take precedence over all other considerations." ***Id.*** (emphasis deleted); ***see also In re A.K.***, 906 A.2d 596, 599 (Pa.Super. 2006) (finding statutory factors "clearly place the trial court's focus on the best interests of the child") (quoting ***In re C.V.***, 882 A.2d 481, 484 (Pa.Super. 2005)).

In this case, Mother argues that the trial court abused its discretion by concluding that ECCYS presented clear and convincing evidence sufficient to warrant a permanency goal change from "reunification" to "adoption." Specifically, Mother points to her compliance with the permanency plan, evidenced by her willingness to undergo a drug and alcohol assessment, to attend counseling and visitation with Child, and to make substantial progress with her parenting skills. She also points out that she has obtained stable housing and that her new paramour, now husband, has a positive relationship with Child.

The trial court rejected Mother's arguments and instead properly focused on the best interests of Child. ***See In re N.C.***, 908 A.2d at 823. The

court found that Child's interests were best served by changing her permanency goal to adoption where her bond with Mother was insecure and she continued to exhibit the adverse effects of the criminal behavior perpetrated against her by Mother. **See** Tr. Ct. Opinion, 10/18/18 at 10; Tr. Ct. Rule 1925(a) Opinion, 11/16/18 at 2.

After reviewing the trial court's opinions, the record, the parties' briefs, and relevant law, we discern no abuse of discretion or error of law. Accordingly, we affirm on the basis of the well-reasoned opinions of the Honorable Richard A. Masson, President Judge, which we adopt and incorporate herein. **See id**.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/23/2019



## IN THE COURT OF COMMON PLEAS OF THE FIFTY-NINTH
## JUDICIAL DISTRICT OF PENNSYLVANIA

IN THE INTEREST OF A.K.W.,         *       COUNTY BRANCH - ELK
D.O.B. ███████              *
                             *
                             *       JUVENILE
                             *
                             *       NO. CP-24-DP-13-2016

## DISCUSSION, FINDINGS OF FACT and MEMORANDUM OPINION

A hearing was conducted on June 13, 2018, on the motion for goal change filed on behalf of Elk County Children and Youth Services (ECCYS) on February 12, 2018. In its motion, ECCYS sought to change the placement goal of the subject minor child, ███████████ (hereafter A.K.W.), now age 4, born August 30, 2014, from the goal of return to parent or guardian with the concurrent goal of adoption to the goal of adoption.

At the time of the hearing, ECCYS was represented by its solicitor, Attorney George N. (Jim) Daghir, and the interests of A.K.W. were represented by Attorney Thomas G. G. Coppolo. A.K.W.'s natural mother, ██████████████████ was present and represented by Attorney Christopher J. Martini. A.K.W.'s father, ███████████████ did not appear for the hearing despite having been properly served with the goal change motion, order of court and notice of hearing sent by both first class mail and certified mail, restricted delivery, return receipt requested by ECCYS on March 5, 2018. The domestic return receipt signed by ████████████ mother, ███████████, on March 9, 2018, was admitted as ECCYS Exhibit A and the first class mail sent to ████████████ was not returned as unclaimed or undelivered. Furthermore, on April 26, 2018, a Facebook message was sent to father, the receipt of which was acknowledged by him and another written notice of the hearing was sent him by ECCYS by first class mail which was also not returned as unclaimed or undelivered.

At the beginning of the June 13, 2018 hearing, the Court took judicial notice of the record of this dependency case, including all pleadings and orders. Testimony was then received from Dr. Allen H. Ryen, ███████████████, the foster mother of A.K.W., Amy Donachy of the Dickinson Center, Inc., Skyler Galford, the teacher for the Northern Tier Community Action



Head Start preschool, ECCYS Caseworker Becky Taylor, and Jolene Grolemund of the Dickinson Center, Inc. Documentary evidence was also introduced. Having considered all of the evidence presented at the time of hearing, the Court finds as follows.

## FINDINGS OF FACT

1. The subject minor child is ████████████ (A.K.W.), now age 4, born August 30, 2014. She is the natural daughter of ████████████ (mother) and ████████████ (father).

2. ████████████ was properly served with the goal change motion, order and notice of the hearing date, time and location by ECCYS to the address of ████████████, Kingman, Arizona, and despite proper service, father did not appear at the goal change hearing nor did he request the appointment of counsel to represent him.

3. Despite father having been notified of all hearings involving A.K.W., he has not appeared for any hearing and has had minimal contact with ECCYS.

4. The circumstances by which A.K.W. was placed in the custody of ECCYS are compelling. ECCYS was granted emergency custody of A.K.W. on October 24, 2016, after mother and her then-paramour, ████████████, were criminally charged with physically abusing, assaulting, and otherwise traumatizing A.K.W. The prosecution of mother resulted in a trial and mother was found guilty by a jury of the charge of endangering the welfare of A.K.W. (ECCYS Exhibit D) at the conclusion of the trial on January 26, 2018.

5. After A.K.W. was placed in foster care by virtue of the October 24, 2016 emergency custody order, a shelter care hearing was conducted on October 26, 2016, and custody of A.K.W. continued to be placed with ECCYS.

6. An adjudication hearing on the dependency petition filed in this matter was held on November 3, 2016, and A.K.W. was adjudicated to be a dependent child as being a child who was without essential parental care and control. A disposition hearing was then conducted on November 23, 2016, with ECCYS being awarded custody of A.K.W., who has continued in placement in foster care with ████████████

7. ECCYS developed a permanency plan for A.K.W. which included the permanency goal of return to parent or guardian with a concurrent goal of adoption. The permanency plan also

2

established requirements for the parents in conjunction with consideration of reunification and the goal of return of A.K.W. to a parent or guardian.

8. Permanency review hearings were held on April 19, 2017, October 17, 2017, and April 5, 2018. In each instance, ECCYS maintained custody of A.K.W. and she continued in the foster care of ████████████████.

9. The findings regarding father's compliance and progress in each of the permanency review proceedings were that he never complied and demonstrated no progress in addressing any of the conditions which had led to the placement of A.K.W. in the custody of ECCYS.

10. During the first review period from November 23, 2016, to April 19, 2017, mother's compliance and progress were both found to have been minimal. She had completed a mental health assessment and scheduled outpatient therapy with the Dickinson Center, Inc. and had also gone in an initial bonding assessment with Dr. Allen Ryen in January 2017. She was also engaged in parent/child interactive therapy. However, she had not completed a drug and alcohol assessment, having missed two scheduled assessment appointments, and had been discharged from the Incredible Years parenting education program due to lack of attendance. While she did maintain consistent contact with A.K.W., tellingly, A.K.W. barely acknowledged mother during those visits and was not at all excited to see her. When mother asked A.K.W. if she missed mother or loved mother, A.K.W. would not respond.

11. At the time of the October 17, 2017 permanency review hearing, mother's compliance and progress were again found to have been minimal. She had not participated in nor followed any treatment recommendations as no mental health treatment had been initiated despite the efforts and support of ECCYS to facilitate the treatment recommended as a result of the psychological evaluation conducted by Dr. Leavitt during the first permanency review period. She had completed a drug and alcohol evaluation on August 25, 2017, the result of which was that no substance abuse treatment was recommended. While she was consistent with attending appointments with A.K.W. and with Parents as Teachers, her instability was demonstrated by her having either quit, been fired from, or discharged for an accumulation of points from three different jobs. During this review period, she had also located a residential dwelling, but had been evicted from that dwelling and moved into a trailer with a new paramour, ████████ who mother began dating in June 2017.

3

12. While A.K.W. responded well to ███████ her bond with mother remained strained and she would not acknowledge mother, who continually sought affirmation from A.K.W. during visits. A.K.W. frequently wanted to terminate the visits with mother shortly after they had begun and if mother raised her voice, A.K.W. appeared to be fearful and cowered. The foster parents also noted an exacerbation with toilet training issues after A.K.W. had visits with mother, with A.K.W. regressing in the training.

13. Mother's compliance with the permanency plan improved to the moderate level during the next review period from October 2017 to April 2018, but mother's progress continued to be minimal. Mother reestablished mental health treatment services in December 2017 with a mobile therapist from the Dickinson Center, Inc. Mother also maintained biweekly one hour visits at ECCYS with A.K.W. Beginning in November 2017, mother's paramour, ███████, began to attend some of those visits and the ECCYS caseworker observed that A.K.W. demonstrated a continued preference for him as opposed to mother.

14. The testimony of Dr. Allen H. Ryen, a licensed psychologist who was accepted as an expert witness, was highly compelling. Dr. Ryen has engaged in thousands of bonding assessments in his long career. He assessed mother and A.K.W. on two occasions for purposes of bonding and used generally accepted methods in his assessments, including his observations of language exchanges and displays of emotions during parent/child reunions and separations. In addition to his observations and interviews, he also looked at photos which depicted A.K.W.'s physical abuse.

15. Dr. Ryen's first bonding assessment took place in January 2017. In his report admitted as ECCYS Exhibit B, he recited that the purpose of a bonding assessment is to establish the degree of attachment, bonding, or psychological interdependence, typically between parents and child. He further noted that parental bonds are considered primary under normal circumstances and central to normal child development. He ultimately determined that A.K.W. and mother had a bond that was conflicted and insecure. It was not a healthy bond as mother was not a primary attachment for A.K.W. While he did not conclude that a pathological bond existed between mother and A.K.W. in which the child's need would be poorly met, he found that an insecure bond clearly existed and while in theory mother and A.K.W. could revive a primary bond, the insecure bond was much less likely to be able to be revived.

4

16. In June 2018, Dr. Ryen conducted a second bonding assessment of mother and A.K.W. and it was his opinion that while mother was better adjusted, the bond between her and A.K.W. had not improved and in some respects had deteriorated. In his June 7, 2018 report admitted as ECCYS Exhibit C, he noted that it was not clear that A.K.W. had ever enjoyed a secure bond in her relationships with either of her natural parents and she appeared to be quite happy and contented in foster care. He testified that he found no improvement in the quality of mother's and A.K.W.'s bond between January 2017 and June 2018, and no enhancement in their relationship. Dr. Ryen determined that A.K.W. in all likelihood questions her safety in mother's care and does not trust mother to protect her. This was consistent with the morbid and violent content in A.K.W.'s observed play which included placing dolls in the microwave and running them over with toy vehicles. He found that A.K.W. has unresolved conflicts with mother related to the trauma inflicted upon her by mother and ███████ and these early experiences left a mark on A.K.W.'s psyche which has caused A.K.W. to be neutral at best in her responses to mother's appropriate overtures. While mother has presented with an improvement in her adjustment, A.K.W. has been unable or unwilling to assume any risk in extending any emotional attachment to mother.

17. At the time of hearing, A.K.W. had been in foster care for a significant portion of her life and while Dr. Ryen noted that foster care can impact a parent/child bond, A.K.W. had adapted well to her foster care and was developing appropriately. He also noted that the lack of positive interaction between mother and A.K.W. and the potential for an adverse affect upon A.K.W. in the nature of an increase in her anxiety due to her lack of trust of mother. When asked about the possibility of remediation of the bond between mother and A.K.W., Dr. Ryan found that likelihood was remote and did not believe that the bond would ever be able to be repaired notwithstanding the personal improvement of mother and A.K.W.'s improvement to the point where she appeared to be above average on her developmental track.

18. In January 2017, Dr. Ryen described A.K.W. as a lost child with no bond with anyone while in June 2018, he found that she has a bond with someone other than mother. He also believed that A.K.W. knows and remembers who hurt her and has built a wall of self-protection, a component of which is that A.K.W. does not think that mother will keep her safe.

5

19. Dr. Ryen determined that future visits with mother would not be in A.K.W.'s best interests and ultimately that there will be no psychological damage to A.K.W. if her parental bonds are ultimately terminated.

20. The testimony of ██████████, the foster mother of A.K.W. confirmed some of the observations of Dr. Ryen in terms of reactions to trauma in the nature of A.K.W. refusing to go to the bathroom, becoming more aggressive, and having night terrors after visits with mother. She exhibited those aberrant behaviors after every visit and those visits with mother were the only variable as otherwise she is well adjusted. ██████████ has engaged A.K.W. in play therapy once a month to address the issues with night terrors and has also enrolled her in the Head Start program. She also noted that A.K.W. never asks about mother or inquires about seeing mother. Finally, ██████████ indicated that she and her husband, ██████████, would adopt A.K.W. if the opportunity arose.

21. Other therapists or service providers to whom mother was referred in the effort to enhance the rehabilitation of her relationship with A.K.W. noted their concerns and observations. Amy Donachy, who in conjunction with the Parents as Teachers program began meeting with mother and A.K.W. in July 2017 on a bi-monthly basis for one hour in order to coach positive parent and child interaction, noted that mother struggled with every visit until January 2018 and really did not participate during visits until that time. Instead, she would often simply sit on the floor and not interact with A.K.W. Rather, Ms. Donachy found that mother's boyfriend, ██████████ was more positive with A.K.W., who seemed to enjoy interacting with him notwithstanding that mother had made some moderate progress in the parent/child interactions since January 2018 and required less prompting to engage A.K.W.

22. Skylar Galford, the head teacher for the Head Start Preschool Program of Northern Tier Community Action, has been familiar with A.K.W. and found her to be somewhat aggressive with other students and the assistant teacher, with episodes of aggression occurring about once a week. However, she could not assign any specific cause to those aggressive episodes.

23. Joleen Grolemund, an outpatient/forensic therapist with the Dickinson Center, Inc., indicated that she has been familiar with mother since November 2016 and has provided individual therapy counseling to mother, who she has met weekly since March 2018 after having only 18 visits with mother from November 2016 until March 2018, during which period mother

6

attended about a quarter of the scheduled appointments. While she believes that mother has been making some progress in therapy, she has not seen mother interact with A.K.W.

24. In spite of the efforts made by ECCYS to provide A.K.W.'s parents with the means to comply with the permanency plan developed in this case, neither parent demonstrated the capacity to maintain positive momentum or progress necessary to ensure the health, safety, and welfare of A.K.W. and to otherwise promote her development. Father's compliance was nonexistent and mother has been unable to demonstrate that she can rehabilitate the near-fatally impaired bond between she and A.K.W. or to maintain the stability and continuity necessary to permit consideration of her achieving the permanency plan goals.

25. Neither father nor mother has sustained any progress toward alleviating the circumstances which resulted in the initial placement of A.K.W. in October 2016.

26. The current permanency goal of return to parent or guardian with the concurrent goal of adoption was not attainable or viable given the failure of the parents to demonstrate the ability to address the issues which led to placement and to comply with the plans established to address those issues. Father has unequivocally exhibited that he does not intend to assume any parental role. Mother in turn perpetrated abuse upon A.K.W. which led to mother's criminal conviction and the mother/daughter bond is not a secure primary bond, which is the first and strongest bond that is optimal to the parent/child relationship but at best is an insecure bond which is unlikely to be able to be resuscitated or improved.

27. The previously identified goal achievement dates by which A.K.W. was expected to be able to be returned to a parent or guardian has shown to be unrealistic and unattainable. The new permanency goal of adoption may be accomplished by February 28, 2019, in light of the pending petition for involuntary termination of parental rights filed by ECCYS.

28. ECCYS provided sustained and reasonable efforts to finalize the permanency plan, but were thwarted by father's complete lack of engagement in any parental duties and mother's pending criminal charges coupled with mother's inability to sustain the efforts necessary for consideration of return to her. It has been solely the unwillingness or inability of mother and father to effectuate changes and comply with the permanency plan which resulted in the failure to finalize the plan.

29. A.K.W. is completely safe in her current setting and has thrived in the foster home of ████ and ████████, who have done nothing to foil or frustrate either parents' contact with

7

A.K.W. The ███s are also an adoptive resource for A.K.W. and have indicated that given the opportunity, they will seek to adopt her.

30. The resolution of the criminal charges against mother included the finding by a jury on January 26, 2018, that she was guilty of the offense of endangering the welfare of A.K.W. 18 Pa. C.S.A. 4304(a), a felony of the third degree, as mother was found to have endangered A.K.W. as a result of a course of conduct.

31. The best interests of A.K.W. will be met by modifying the permanency placement goal from return to parent or guardian with a collateral goal of adoption to the primary and exclusive permanency goal of adoption.

32. On March 1, 2018, ECCYS filed a petition for the involuntary termination of the parental rights of A.K.W.'s natural parents on the basis that A.K.W.'s return to either of her parents is not in her best interests nor is it best suited to her safety and protection or her physical, mental, and moral welfare.

## MEMORANDUM OPINION

It is the best interests of the child and not the interests of the parents which must be the focus of the court in a goal change proceeding as the parents' rights are secondary. In Re: A.K., 936 A.2d 528, 532-533 (Pa. Super. 2007). It is also the burden of the child protective service agency, which in this case is Elk County Children and Youth Services (ECCYS), to prove that the goal change from return to parent or guardian with the concurrent goal of adoption to one of adoption alone would be in the best interest of the subject minor child, A.K.A., age 4, born August 30, 2014. In the Interest of M.B., 449 Pa. Super. 507, 674 A.2d 702, 704 (1996). Therefore, there is a distinct difference in the focus between a goal change proceeding and a proceeding for the involuntary termination of parental rights, because in a termination of parental rights action, the concentration is to be on the conduct of the parents under 23 Pa. C.S.A. 2511. In Re: M.B., 774 A.2d at 705.

As a result of the permanency review hearings held from April 2017 through April 2018 the Court consitently made findings of the continued necessity and appropriateness of A.K.W.'s placement outside of the residence of either parent. Mother's compliance with the permanency plan waxed and waned from minimal to moderate while father's compliance was a nullity. One

8

constant was the minimal progress by mother in alleviating the circumstances that necessitated placement. Another constant was that father consistently demonstrated no compliance or progress, but removed himself from the permanency plan entirely. While the placement goal of return to parent or guardian with the collateral role of adoption was appropriate and viable in the past, with the passage of time, the superficial efforts exerted by mother and father's abject failure to be involved with A.K.W.'s life, those goals are no longer practical or attainable. The likely date by which the initial placement goal might have been achieved was continually extended because of the failure to comply and the lack of progress made by A.K.W.'s parents. As time went on, the extended goal attainment dates were founded on the prospect that mother might be able to demonstrate material and lasting changes in the circumstances which led to placement but eventually those permanency goal dates became hypothetical. Notwithstanding that prior to ECCYS involvement, competent parenting may have been a façade, the ability of either mother or father to be an effective parent for A.K.W. has been entirely eroded and it is no longer reasonable or sensible to further promote unrealistic expectations that either parent may change and become consistent, stable and effective parents for A.K.W. or in any way revive the impaired parent/child bonds. Most importantly, it is not in A.K.W.'s best interest to promote the reunification with either of her parents. She has now been removed from mother's care, custody, and control for almost half her life and the circumstances which led to her removal were that mother endangered her welfare, for which mother was found to be criminally culpable. A.K.W. has flourished in foster care and both her parents have been entirely unable to make any meaningful changes in the conditions which led to her removal. Their inabilities to do so foreclose consideration of her return to either of them.

Father's detachment from A.K.W. has been unremitting as he has never been a material part of her life. Mother's criminal actions compelled A.K.W.'s removal and mother has been unable to effectuate the necessary changes in her personal life to facilitate consideration of return of A.K.W. to her. There is nothing conducive in the parenting of mother or father to A.K.W.'s best interests and it is manifestly clear that those interests will be best met by a change in the permanency goal to adoption.

The Court has addressed the inquiries mandated by 42 Pa. C.S.A. 6351(f) and determined that modification of the permanency goal is required to promote the safety, protection and physical, mental, and moral welfare of A.K.W. The Court has also considered the impaired and

9

insecure parental bond between A.K.W. and her mother and the lack of any bond whatsoever between A.K.W. and her father. In re: H.V., 37 A.3d 588, 594, 595 (Pa. Super. 2012). The evidence introduced by ECCYS clearly demonstrated that A.K.W. has no secure primary bond with mother but rather an insecure bond for which there is poor prognosis for any improvement. Moreover, there can be no bond found to exist or having ever existed between A.K.W. and her father, Colum Wickerd.

ECCYS introduced sufficient evidence of significant weight to support the grant of a motion to change the permanency placement goal. Despite giving A.K.W.'s parents time, resources, and opportunity to address and alleviate the issues and conditions which led to ECCYS involvement and the necessity to maintain A.K.W. in foster care, neither parent made any positive or discernible progress in developing the parental skills required to permit reasonable consideration for her return to either parent. Father has not been involved in A.K.W.'s life for any demonstrated period and mother committed acts that placed A.K.W. at risk of harm that rose to the level of a criminal act having been perpetrated by mother upon A.K.W. with lasting adverse consequences. Mother's inability to fully cooperate with service providers or to implement therapeutic suggestions in conjunction with her inability to comply with permanency plans and abide by recommendations are compounded by the lack of any parental bond as to father and the insecure bond between mother and A.K.W. Neither of those bonds can be found within any degree of reason to be likely to be improved upon or strengthened and neither parent can be found to be a positive factor in A.K.W.'s life.

Despite the emotional ties expressed by mother for A.K.W., the impaired and insecure bond she has with A.K.W., her negative actions resulting in her criminal conviction, her at best marginal compliance with the permanency plan, the dearth of any action by father to comply with the permanency plan, and the lack of any bond between him and A.K.W. demonstrate that neither parent is able to provide A.K.W. with the parenting necessary to promote her best interests. It is this focus fixed on her interests and not on the parent's interests which results in the change of goal to adoption.

By the Court:

October 18, 2018

Richard A Masson, President Judge

10

# IN THE COURT OF COMMON PLEAS OF THE FIFTY-NINTH
## JUDICIAL DISTRICT OF PENNSYLVANIA

IN THE INTEREST OF A.K.W.,          \*        COUNTY BRANCH - ELK
D.O.B. ████████                  \*
                                  \*
                                  \*        JUVENILE
                                  \*
                                  \*        NO. CP-24-DP-13-2016

## TRIAL COURT OPINION PURSUANT TO Pa. R.A.P. 1925(a)

The generic and sole assertion of appellant ████████████ in her concise statement is that this Court erred in determining that the requisite clear and convincing evidentiary threshold had been met by Elk County Children and Youth Services and that consequently the change of goal from return to parent to adoption was warranted. However, the record of this case demonstrates that the evidence supports entirely this Court's findings and conclusions.

The scope of appellant's concise statement of errors is very broad and lacks any definition. Pa. R.A.P. 1925 is intended to aid trial judges in the identification of and focus upon those issues which an appellant ultimately intends to promote on appeal and when a trial court has to guess what issues an appellant is appealing, that potential for speculation is inadequate for meaningful review. Com. v. Smith, 955 A.2d 391 (Pa. Super. 2008). Given the lack of any particularity in appellant's statement of errors, at best it is the entirety of the record which must be considered, to be challenged and this Court is well satisfied that the record includes the necessary clear and convincing evidence on which this Court based its decision.

The appellant has not provided any specificity in connection with her extremely expansive contention. On the other hand, this Court provided particular delineations relating to mother's compliance and progress with the permanency plan and her conflicted and impaired bond with the subject minor child, A.K.W., age 4. Additionally, the Court made a specific finding that a jury had found appellant guilty of the third degree felony offense of endangering the welfare of A.K.W. as a result of a course of conduct. That conviction required that the jury

found that each element of the offense and that the appellant had committed that offense had been proven beyond a reasonable doubt. This conviction is certainly not conclusive in and of itself, but is another compelling component in this Court's findings.

This Court also recited that Elk County Children and Youth Services had introduced sufficient evidence of significant weight and that it was manifestly clear that the interests of A.K.W., which are the paramount interest for determination in a goal change proceeding, would be met by a change in the permanency goal from return to parent or guardian to adoption. A.K.W., who is now four years of age and who has been removed from appellant's custody for half her life.

It is abundantly apparent that the record in this case includes evidence that was so "clear, direct, weighty, and convincing so as enable the tier of fact to come to a clear conviction without hesitance, of the truth of the precise facts in issue." In re: D.A., 801 A.2d 614, 617 (Pa. Super. 2002); In re: J.L.C., 837 A.2d 1247, 1251 (Pa. Super. 2003). Accordingly, this Court respectfully directs the Superior Court of Pennsylvania to the October 18, 2018 Discussion, Findings and Memorandum Opinion of this Court as the basis for the October 18, 2018 order from which the pending appeal has been taken.

Respectfully submitted

December 12, 2018

Richard A Masson, President Judge